# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7325 | **DATE** | 12/27/2004 |
| **CASE TITLE** | Clifton Sayles vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without} prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on defendant's motion for summary judgment. Defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's motion for summary judgment is granted insofar as it requests a remand in the case. Accordingly, the cause is remanded, pursuant to sentence four of 42 U.S.C. § 405g to the Commissioner for further proceedings consistent with this opinion.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 12/27/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| SM | courtroom deputy's initials | Date/time received in central Clerk's Office | SM mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLIFTON SAYLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 7325 |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Ian H. Levin |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clifton Sayles (hereinafter "Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying his application for Supplemental Security Income (hereinafter "SSI") benefits under Title XVI of the Social Security Act (the "Act"). Before the Court are the parties' cross-motions for summary judgment in the cause. For the reasons set forth below, the Court remands the cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On August 17, 1998, Plaintiff applied for SSI benefits alleging he became disabled as of June 1, 1997.[1] (R. 118-19.) Plaintiff's application for benefits was initially denied and, denied again, upon reconsideration. (R. 72-81.) Plaintiff then filed a timely request for an administrative hearing

---

[1]References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).



and, on December 16, 1999, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge (hereinafter "ALJ").[2] (R. 82, 36-71.)

On February 22, 2000, the ALJ issued her decision finding that Plaintiff was not disabled. (R. 11-21.) Plaintiff then filed a request for review of the ALJ's decision and, on September 29, 2000, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 5-6.)

Plaintiff subsequently initiated civil action for judicial review of the Commissioner's final decision and, on December 7, 2001, Magistrate Judge Sidney I. Schenkier issued an opinion and order remanding the cause to address the shortcomings in the ALJ's analysis at step five of the sequential evaluation and to further articulate the basis of her credibility determination. *See Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850 (N.D. Ill. Dec. 7, 2001). On remand, the ALJ held a second administrative hearing on March 6, 2003 and issued a second decision on July 18, 2003 finding that Plaintiff was not disabled. (R. 440-50, 452-79.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated the subject civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

The following facts are taken from the administrative record and two administrative hearings held on December 16, 1999 and March 6, 2003 where Plaintiff, two vocational experts (hereinafter "VE") and a medical expert (hereinafter "ME") testified.

## I.     PLAINTIFF'S TESTIMONY

### A.     Introduction

---

[2]The administrative hearing scheduled for November 5, 1999 was continued so that Plaintiff could obtain legal counsel. (R. 31-35.)

2

Plaintiff was born on May 30, 1949. (R. 118.) He has an eleventh grade education. (R. 143.) Plaintiff's past employment includes *inter alia* car repair, landscaping, window washing, maintenance, rubbish disposal and painting. (R. 44, 66, 132.) The only jobs he performed where he earned substantial earnings were those of maintenance worker and trash collector. (R. 14-15.)

Plaintiff suffers from various physical impairments including insulin-dependent type II diabetes mellitus, glaucoma and asthma. (R. 443.)

### B.    Administrative Hearing held on December 16, 1999

At the December 16, 1999 administrative hearing, Plaintiff testified that, on June 1, 1997, he stopped working because he was convicted and sent to prison for the sale and delivery of a controlled substance. (R. 43-44, 120, 126, 132.) He was released from prison in 1998 and his parole ended in 2001. (R. 44.) Since his release from prison, Plaintiff has lived with various family members including his brother and sister-in-law. (R. 42.) Plaintiff does not pay rent or contribute to mortgage payments because he has no source of income. (*Id.*)

Plaintiff stated he spent his time at the corner store and barber shop visiting with other men who also spent their time there. (R. 53.) Plaintiff indicated he sometimes rode his bicycle or walked to the corner store. (R. 54-55.) He stated he watched television, read the newspaper, and did about ten sit-ups every other day. (R. 53-54.) He did not leave the house except for when he went to the corner store. (R. 55.) Plaintiff testified he purchased groceries, cooked for himself and occasionally washed dishes, but he did not clean the house or do laundry. (R. 53-54.) He indicated he was able to tend to his personal hygiene which entailed bathing and dressing himself. (R. 54.) Plaintiff stated he napped for a couple of hours each day after lunch. (R. 62-63.)

Plaintiff testified he could sit all day and lift up to fifty pounds, but he could only stand for about an hour. (R. 51.) He indicated his feet ached because of foot ulcers caused by his diabetes (R. 49, 56) and he could only stand for about an hour because his feet and legs tire. (R. 56.) Plaintiff stated he needed to urinate up to seven times per day and every hour at night which left him tired during the day. (R. 61.) He indicated that when he reads for about forty-five minutes, the "lines run together" and become blurry due to his diabetes. (R. 50.) Plaintiff testified he has glaucoma and his right eye is affected more than his left eye (R. 46-47.) He uses medication eye drops for this condition. (R. 47.)

Plaintiff stated that he had various additional problems associated with his eye impairment. For example, he testified that he must close and rest his eyes for about forty-five minutes after concentrating or focusing on an object for about forty-five minutes to an hour. (R. 58-59.) He further indicated that at nighttime he cannot see because "[e]verything is blurry" and he is unable to judge distances. (R. 59.) Plaintiff stated his peripheral vision is limited, especially on his right side (R. 59); his vision is getting dimmer (R. 48); and his depth perception problems cause him to knock over things over when he reaches for them. (R. 60.)

Plaintiff testified he also suffers from asthma and uses an inhaler every day. (R. 48-49.) He indicated he cannot walk more than a couple of blocks before he starts to wheeze and becomes short of breath. (R. 50.) Dust, perfume, dry air, cigarette smoke and bleach cause Plaintiff's asthma to flare-up. (R. 57.) In the past, Plaintiff sought emergency medical treatment due to his asthma attacks. (R. 50.)

Plaintiff stated he experienced side-effects from the insulin he takes for his diabetes which sometimes makes him feel weak and dizzy. (R. 50.) He testified that the eye drops he uses twice

4

a day for his glaucoma cause his eyes to burn so he must keep his eyes closed for one and a half hours after using the drops. (R. 62.) Plaintiff indicated he no longer used illegal drugs, but he occasionally consumed a few beers even though he has received treatment for alcohol abuse. (R. 51-52.)

## C.    Administrative Hearing held on March 6, 2003

At the March 6, 2003 administrative hearing, Plaintiff testified that he does not have a permanent place of residence or permanent address. (R. 456-57.) Family members would no longer provide housing for Plaintiff because he does not have a source of income. (R. 458.) Plaintiff was unable to receive township assistance because he does not have a permanent address. (R. 457-58.) He did not receive public assistance and did not have a medical card. (R. 455-57.)

Plaintiff was not receiving regular medical care; however, in early March of 2003, he had been treated at the emergency room of Evanston Hospital because he thought he had a problem with the circulation in his feet. (R. 458.) His right foot ached and his big toe was turning black. (R. 459.) Plaintiff was told to soak his right foot at night. (*Id.*) Plaintiff also indicated that it had been about four years since he had his eyes checked by a physician. (R. 460-61.) He has glaucoma and stated he cannot see anything out of his right eye and has foggy vision in his left eye. (R. 461.) Plaintiff has this problem with his left eye about once a month which lasts about half an hour. (*Id.*) He stated that when he reads the letters become blurry and he has the same pair of glasses as he had four years ago. (R. 467.)

Plaintiff stated he had lost about forty pounds and only ate one meal a day. (R. 462.) He spent most of his time at the barbershop watching television and had lunch at church with his cousin on Mondays, Tuesdays, and Thursdays. (*Id.*) Plaintiff was not seeking treatment for his medical

conditions because he does not have a medical card. (*Id.*) He testified that he did not know he could receive free medical treatment despite the fact that he did not have a medical card. (*Id.*) Plaintiff was taking over-the-counter medication (Tylenol) for pain (R. 464) and used his friend's insulin about twice a week when his blood sugar level was high. (R. 465, 468.) He tested his blood sugar level every other day and typically it was around 200. (R. 465-66.) Plaintiff further indicated that he was using over-the-counter eye drops for his eyes and had no medication to treat his glaucoma. (R. 466-67.)

## II.  MEDICAL EVIDENCE

The medical evidence in the record substantiates Plaintiff's testimony that he suffers from glaucoma, insulin dependent type II diabetes mellitus and asthma.

Beginning in February of 1998, physicians prescribed Humulin and/or insulin for Plaintiff's diabetes as well as medication eye drops for his glaucoma. (R. 187-88.) In a routine physical examination by the Illinois Department of Corrections, dated May 4, 1998, Dr. Hawk determined Plaintiff suffers from asthma, glaucoma and diabetes. (R. 156, 158.) On June 18, 1998, just before Plaintiff's release from the penitentiary, medical progress notes indicate he was an insulin dependent diabetic, was taking Humulin for his diabetes and wore glasses. (R. 159.)

On September 2, 1998, Dr. Bhushau prepared a medical report indicating Plaintiff has diabetes, glaucoma and asthma. (R. 189.) Dr. Bhushau noted Plaintiff had poor vision as a result of his glaucoma and recommended a treatment plan of Humulin for his diabetes, and other medications, including eye drops, for his glaucoma. (*Id.*) Another medical report from St. Francis Hospital, dated September 2, 1998, indicated Plaintiff had no treating physician and suffered from diabetes, glaucoma, asthma and poor visual acuity in his right eye. (R. 190-91.) The report noted

6

that Plaintiff's asthma was "not bothering" him at that time and he had not used any illegal drugs for the past three years. (R. 191.) The medical report noted Plaintiff claimed he could not work because he needed to use eye drops and, moreover, he was under stress because he had recently been released from the penitentiary. (R. 192.) A second report from St. Francis Hospital, dated September 9, 1998, notes that Plaintiff has type II diabetes mellitus. (R. 183.)

On September 25, 1998, Dr. Hilton Gordon, M.D. performed a consultative examination of Plaintiff. (R. 168-71.) Dr. Gordon confirmed that Plaintiff suffers from insulin dependent diabetes, glaucoma and asthma. (R. 170.) At the time of the examination, Plaintiff reported he has glaucoma and "[h]is right eye is worse than the left and is somewhat blurred at time[s]" but "[i]t seems to be okay when he wears his glasses." (R. 168.) Plaintiff reported he uses eye drops on a daily basis, but he denied *inter alia* having frequent urination (polyuria), ulcers or infections. (*Id.*) He also indicated he takes medication for his asthma and did not have any shortness of breath, wheezing or coughing at that time. (*Id.*) Plaintiff reported he could walk two blocks, go up a flight of stairs and do light activity without difficulty. (*Id.*) Plaintiff's physical examination was essentially unremarkable except for the noted visual defects. (R. 168-71.)

Dr. Joseph Mejia, M.D., performed a consultative ophthalmologic evaluation of Plaintiff on September 25, 1998. (R. 164-67.) Dr. Mejia reported Plaintiff had a history of glaucoma and diabetes. (R. 164.) He noted that Plaintiff's uncorrected visual acuity in the right eye was 20/70 and his best corrected visual acuity in the right eye was also 20/70. (*Id.*) In the left eye, Plaintiff's uncorrected visual acuity was 20/70 and his best corrected visual acuity in the left eye was 20/30. (*Id.*) Dr. Mejia noted that Plaintiff's visual fields in the right eye were markedly constricted and almost non-existent. (R. 164-65.) Moreover, he reported that the visual fields in Plaintiff's left eye

were also markedly constricted. (R. 165.) Dr. Mejia diagnosed Plaintiff with end-stage glaucoma and indicated "the pressures are well-controlled." (*Id.*)

Dr. Charles Kenney, M.D., a state agency physician, reviewed Plaintiff's medical record and, on October 3, 1998, completed a Physical Residual Functional Capacity Assessment form. (R. 172-79.) Dr. Kenney opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and had unlimited pushing and pulling abilities. (R. 173.) Moreover, Dr. Kenney indicated that Plaintiff had "no complications" from his diabetes, but he had bilateral "marked field restrictions" from the glaucoma in his eyes. (R. 173, 175.) With respect to Plaintiff's asthma, Dr. Kenney noted that Plaintiff's lungs were clear (R. 173); however, he should "avoid concentrated exposure" to *inter alia* "fumes, odors, dusts, gases, [and] poor ventilation." (R. 176.)

Plaintiff was treated by Dr. A. Olajos, M.D., at St. Francis Hospital for the flu on October 7, 1998. (R. 182.) At that time, Dr. Olajos noted Plaintiff was "stressed" and admitted to using "ETOH" and cocaine recently, as much as two times per week. (*Id.*) Dr. Olajos indicated Plaintiff had an "acute problem" with drug use and referred him for possible detoxification and hospitalization. (*Id.*) At that time, Dr. Olajos noted that Plaintiff's blood sugar level was high and indicated that Plaintiff might need a higher insulin dosage. (*Id.*) Dr. Olajos also referred Plaintiff to Dr. J.C. Michael, M.D., for a retinal evaluation. (R. 291-92.)

On December 17, 1998, Dr. Michael examined Plaintiff and diagnosed him with end-stage glaucoma in the right eye with moderate signs of glaucoma in the left eye. (R. 291.) He further opined that Plaintiff had diabetes "but fortunately shows no diabetic retinopathy." (*Id.*) On examination, Dr. Michael found that Plaintiff's "visual acuity measured 20/400 O.D. pinholing to

8

20/100 and 20/20 O.S." presumably in his right eye (the report does not indicate which eye). (*Id.*) Dr. Michael referred Plaintiff to a glaucoma specialist for further evaluation and management of his glaucoma. (R. 291-92.)

Dr. Thomas E. Bournias, M.D., performed bilateral glaucoma eye laser surgery on Plaintiff in January of 1999. (R. 279.)

A computation of visual efficiency chart completed on January 28, 1999 showed that, with regard to Plaintiff's right eye, his visual acuity was 20/70, his visual field efficiency was 20.8 percent and his visual efficiency was 11.44 percent. (R. 248.) With respect to Plaintiff's left eye, his visual acuity with correction was 20/30, his visual field efficiency was 31 percent and his visual efficiency was 28.52 percent. (*Id.*)

On February 17, 1999, Dr. Anthony G. Finder, M.D., performed a consultative ophthalmologic evaluation of Plaintiff. (R. 270-73.) Dr. Finder found that:

> [Plaintiff's] visual disability is that of severe monocular visual loss with relatively normal vision in the fellow eye. He would be expected to have difficulty with tasks requiring stereopsis. There is also very limited peripheral vision to the right side. (R. 271-72.)

Dr. Finder further indicated that although Plaintiff's "intraocular pressure" was "under control," he was experiencing side-effects from his medication. (R. 270-71.) He further reported that Plaintiff's diabetes was controlled when he took Humulin. (R. 270.) Dr. Finder's prognosis for Plaintiff was "fair to good." (R. 271.) He further found that there did not appear to be any limitations with respect to Plaintiff's "ability to hear, sit, stand, walk, lift, carry or handle objects." (R. 272.)

A computation of visual efficiency chart completed on February 22, 1999 indicated Plaintiff had no useful vision in his right eye. (R. 247, 444.) With respect to Plaintiff's left eye, his visual

acuity with correction was 20/20, his visual field efficiency was 88.6 percent and his visual efficiency was 88.66 percent. (*Id.*)

Dr. Iulia Ana Enacopol, M.D., performed a consultative internal medical evaluation of Plaintiff on February 25, 1999. (R. 241-45.) At that time, Plaintiff complained of vision problems and weakness and swelling in his knees. (R. 241.) With regard to his vision problems, Plaintiff reported he had "trouble judging distance[s]" and his "depth perception [was] off." (*Id.*) Dr. Enacopol noted that Plaintiff's "eye problems started in conjunction with his diabetes in 1987" and had been getting progressively worse. (*Id.*) On examination, Dr. Enacopol noted foot ulcers, but found no other problems and indicated that Plaintiff's asthma was "well-controlled." (R. 242.) Dr. Enacopol noted Plaintiff was taking Humulin for his diabetes and diagnosed him as suffering from insulin-dependent diabetes mellitus, glaucoma and asthma. (R. 244.)

On March 10, 1999, Plaintiff had follow-up treatment with Dr. Bournias which included a pressure check of his eyes. (R. 277.)

Dr. Carl Hermsmeyer, Ph.D., a state agency psychologist, reviewed Plaintiff's medical record and, on March 16, 1999, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form. (R. 249-61.) Dr. Hermsmeyer opined that Plaintiff had only "slight" limitations in his daily living activities and social functioning, and would "seldom" experience deficiencies in concentration, persistence or pace that would result in failing to complete tasks in a timely manner in a work setting or elsewhere. (R. 256.) In addition, Dr. Hermsmeyer reported that Plaintiff was "moderately limited" in his ability to understand and remember detailed instructions, and in his ability to carry out detailed instructions. (R. 258.) Dr. Hermsmeyer further noted Plaintiff's history of substance abuse and indicated he only has the mental capacity to perform

10

simple tasks. (R. 260.)

In another assessment dated March 31, 1999 (R. 262-69), Dr. Boyd E. McCracken, M.D., a state agency physician, found that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and had unlimited pushing and pulling abilities. (R. 263.) The assessment noted that Plaintiff's ambulation and fine and gross manipulation were "unimpaired." (*Id.*) Dr. Boyd further concluded that Plaintiff had "little vision" and "no useful vision" in his right eye, and "good vision and good visual field in the left eye." (R. 263-65.) In addition, it was noted that Plaintiff's depth perception was limited and "due to poor vision in the right eye, for safety's sake [Plaintiff] should avoid heights and moving machinery." (R. 265-66.)

In April of 1999, Cermak Health Services of Cook County notified Plaintiff that he needed to undergo further medical evaluation because an abnormal chest x-ray examination showed right lung scarring. (R. 412.) A follow-up chest x-ray evaluation in July of 1999 indicated that Plaintiff's heart size is at the upper limits of normal and there was thickening of the pleural and lateral aspect of the entire right hem thorax. (R. 413.)

On October 29, 1999, treatment records indicate Plaintiff was prescribed medication for his glaucoma. (R. 277.)

In March of 2003, Plaintiff sought emergency room treatment at Evanston Hospital due to a circulation problem with his feet which entailed his right foot aching and his big toe turning black. (R. 458-59.) Plaintiff was told to soak his right foot at night.[3] (R. 459.)

---

[3]Plaintiff testified that he sought emergency room treatment for his diabetes at the March 6, 2003 administrative hearing. (R. 458-59.)

## III.    VOCATIONAL EXPERTS' TESTIMONY

### A.    Administrative Hearing held on December 16, 1999

Ms. Cheryl Hoiseth, a VE, testified at the administrative hearing held on December 16, 1999. (R. 63-70.) At the hearing, the ALJ initially asked Ms. Hoiseth to classify Plaintiff's past work. (R. 66.) In response, Ms. Hoiseth stated that Plaintiff's previous jobs involving car repair, painting, rubbish disposal, janitorial work, and landscaping ranged in skill level from unskilled to semi-skilled work and entailed light to heavy exertional levels of work. (R. 66.)

In this case, Ms. Hoiseth was asked to provide her opinion on available work on eight hypothetical questions propounded by the ALJ and Plaintiff's attorney. (R. 66-70.) The ALJ first asked Ms. Hoiseth if a hypothetical person of Plaintiff's age (50 years old), educational level and past work experience who could stand, walk or sit for six hours, and lift and carry up to twenty-five pounds frequently and fifty pounds occasionally, but who "[m]ust avoid concentrated exposure to any activities involving unprotected heights, being around moving and hazardous machinery, driving motorized vehicles for work purposes, and dust, odors, fumes, and gases" and is limited to jobs that are simple and routine, that do not require good bilateral vision or good peripheral vision or any depth perception in one eye could perform his past work. (R. 66-67.) Ms. Hoiseth stated that such an individual could not perform any of Plaintiff's past relevant work. (R. 67.) Ms. Hoiseth testified, however, that such an individual could perform work as a cleaner (5,600 jobs) at the light exertional level, bagger (23,000 jobs) at the medium exertional level, and hand packager (5,000 jobs) at the medium exertional level. (R. 67.) The second hypothetical question the ALJ asked Ms. Hoiseth was whether those jobs would still be available "if the person could have *no exposure* to any unprotected heights or moving and hazardous machinery," rather than simply avoiding concentrated exposure.

(R. 67-68.)(emphasis added.) In response, Ms. Hoiseth initially testified that there were no jobs available that Plaintiff could perform and based her opinion on the view that baggers would have to frequently take parcels to cars for customers which would expose baggers to moving cars in parking lots. (R. 68.)

The ALJ then clarified in a third hypothetical question that she was not including moving cars in parking lots in the definition of "moving and hazardous machinery" rather she was "talking more about machinery." (R. 68.) Ms. Hoiseth responded that, based on this third hypothetical, Plaintiff could perform the job of a bagger.[4] (*Id.*) Ms. Hoiseth then went on to explain that the cleaner jobs would not be available because of the exposure to moving machinery (e.g., buffers) and the types of equipment used to perform these jobs. (*Id.*) Moreover, Ms. Hoiseth indicated that the hand packaging jobs would be eliminated because they are frequently performed in factories where industrial trucks pass by. (*Id.*)

In the ALJ's fourth hypothetical question, Ms. Hoiseth was asked to vary the first hypothetical question by assuming the same non-exertional limitations, but changing the exertional limitations to those consistent with performing light work (i.e., lifting and carrying ten pounds frequently and twenty pounds occasionally) rather than medium work. (R. 68-69.) Ms. Hoiseth testified that under this fourth hypothetical, there were hand packager (9,400) and laundry worker (1,800) jobs available. (R. 69.) The ALJ, in her fifth hypothetical question, asked Ms. Hoiseth to assume Plaintiff's limitations and restrictions were as Plaintiff had described them. (*Id.*) In response, Ms. Hoiseth testified that there were no jobs that Plaintiff could perform. (*Id.*)

---

[4]The ALJ, however, never specifically asked, nor did she offer any testimony, as to how many of the 23,000 bagger jobs would be available given these additional limitations. (R. 68.)

Plaintiff's attorney asked Ms. Hoiseth three additional hypothetical questions regarding whether certain additional restrictions would limit Plaintiff's ability to perform competitive work. (R. 69.) The sixth hypothetical question required Ms. Hoiseth to assume that Plaintiff would need to urinate every hour or every other hour during the work day. (R. 69-70.) In response, Ms. Hoiseth stated that Plaintiff's need to urinate every hour would impact his ability to work; however, the need to urinate every other hour would not have such an impact. (R. 70.) In considering the seventh hypothetical question, Ms. Hoiseth was asked to assume that Plaintiff could not focus on an object for more than forty-five minutes to one hour without having to close his eyes to rest them for forty-five minutes or more. (*Id.*) In response, Ms. Hoiseth testified that this limitation would preclude substantial gainful employment. (*Id.*) In the eighth hypothetical question, Ms. Hoiseth was asked to assume that Plaintiff's depth perception problems would cause him difficulty when he reaches and "grab[s] for an item" which would result in him missing or knocking over items. (*Id.*) Ms. Hoiseth testified, in response to the eighth hypothetical, that this limitation would impact his ability to perform work. (*Id.*) Ms. Hoiseth further testified that assuming Plaintiff's testimony was credible, there would be no jobs that he could perform. (*Id.*)

**B.     Administrative Hearing held on March 6, 2003**

At the March 6, 2003 administrative hearing, Mr. Lee Knutson, a second VE, testified.[5] (R. 472-78.) The ALJ initially stated that, in her previous decision, she found that Plaintiff could not

---

[5]Prior to the commencement of Mr. Knutson's testimony, Plaintiff's attorney stated that he sent the ALJ a letter indicating, that pursuant to Magistrate Judge Scheinker's order, the ALJ should have Ms. Hoiseth to testify at the March 6, 2003 administrative hearing. (R. 472.) The ALJ, however, stated that she had denied Plaintiff's attorney's request to recall Ms. Hoiseth and indicated that Plaintiff's attorney could pose the same hypothetical questions to Mr. Knutson and ask any questions from Magistrate Judge Scheinker's order. (*Id.*)

perform any of his past work. (R. 473.) The ALJ then asked Mr. Knutson if a hypothetical person of Plaintiff's age (now 53 years old), educational level and past work experience who could stand, walk or sit for six hours, and lift and carry up to twenty-five pounds frequently and fifty pounds occasionally, but who could not perform any activities involving unprotected heights, being around moving and hazardous machinery, driving motorized vehicles for work purposes, must avoid concentrated exposure to dust, odors, fumes, and gases and is limited to jobs that are simple in routine and do not require binocular vision (limited to monocular vision), good depth perception (no fine or detailed work) or good peripheral vision (particularly from the right side) could perform any jobs. (*Id.*) In response, Mr. Knutson testified that such an individual could perform work as a baggage porter (8,000) and a bagger at a retail trade (15,000) at the medium exertional levels. (R. 473-74.)

The ALJ then varied the hypothetical question and asked Mr. Knutson whether such an individual with no peripheral vision on the right side could perform these jobs. (R. 474.) Mr. Knutson responded that given a baggage porter would be around moving vehicles and a bagger may have to walk out to a parking lot, these jobs would not fit such an individual. (*Id.*) Mr. Knutson testified as follows:

ALJ:   Part of the problem we had with similar jobs that were given last time is the proximity to moving cars and doing probably either one of those jobs, a bagger if he had to carry thing[s] out to a parking lot. And I assume a package porter would be doing the same thing. Is that correct?
VE:    That is correct.
ALJ:   Okay. So with the hypothetical I gave you, with the limited peripheral vision, no peripheral vision basically from the right and not the limitations on the moving machinery would the person still be able to perform those jobs?
VE:    No, I think when you think the fact the bagger may have to walk out to a parking lot. And certainly a porter is around moving vehicles they would not fit. (R. 474.)

The ALJ went on to ask Mr. Knutson whether there were other medium level jobs, such as that of a custodian, which would fit within the hypothetical. (R. 474.) In response, Mr. Knutson stated that a custodian would be exposed to some chemicals, but the exposure would probably not be concentrated exposure. (R. 475.) Mr. Knutson concluded that there would be around 50,000 custodian or janitorial jobs that would not require concentrated exposure to chemicals and fumes.[6] (*Id.*)

The ALJ continued on with the same hypothetical question but changed the exertional limitations to those consistent with performing light work (i.e., lifting and carrying ten pounds frequently and twenty pounds occasionally) and asked Mr. Knutson to provide examples of jobs such an individual could perform. (R. 475.) In response, Mr. Knutson testified that housekeeper (6,000), sales/rental clerks (25,000), and general clerks/helpers (25,000) jobs would be available. (R. 475-76.)

Plaintiff's attorney also elicited testimony from Mr. Knutson. (R. 476-78.) When questioned by Plaintiff's attorney about whether janitors would sometimes need to climb up on ladders and change light bulbs, Mr. Knutson stated that he did not think that most janitors would need to change light bulbs, but an individual such as a school janitor would change light bulbs. (R. 476.) In response to Plaintiff's attorney's question regarding the number of janitorial jobs (50,000) available, Mr. Knutson indicated there were no specific studies delineating the number of janitorial jobs where there is less exposure to chemicals or respiratory irritants. (*Id.*) With regard to the sales clerk jobs,

---

[6]Mr. Knutson reduced the number of available custodian or janitorial jobs from 70,000 to 50,000 to exclude those that have more concentrated exposure to chemicals and fumes. (R. 475.) This reduction, however, was not based on any specific studies. (R. 476.)

Mr. Knutson testified that these types of jobs entail individuals working in retail stores who deal with customers and products. (R. 477.) With respect to the rental clerk jobs, Mr. Knutson stated that an example of such a job would be a counter clerk at a photo finishing booth or a bicycle rental clerk at a bicycle stand. (*Id.*) Mr. Knutson further indicated that the reasoning level for sales/rental clerk jobs was very simple or low reasoning. (*Id.*) Mr. Knutson also stated that the general clerk/helper category included jobs such as a router, fingerprint clerk, routing clerk, checker, and office helper. (*Id.*) He testified that an officer helper, which probably represented the largest number of jobs, performed general clerical work in an office.[7] (R. 477-78.)

## IV.   MEDICAL EXPERT'S TESTIMONY

Dr. William Deutsch, an ME, testified at the March 6, 2003 administrative hearing. (R. 464-71.) At the administrative hearing, Dr. Deutsch stated Plaintiff meets the qualifications for being blind in his right eye and has a corrected visual acuity of 20/20 in his left eye (based on a February of 1999 report) as well as a visual field of eight-four percent of normal vision. (R. 468.) He indicated Plaintiff's eye condition was due to glaucoma, his left eye did not meet any listing, and the combination of his visual impairments did not meet or equal any listing. (R. 468-69.) Dr. Deutsch testified Plaintiff has non-exertional limitations due to his visual impairment which means he is limited to what an individual can do who has monocular vision, should be careful around moving machinery and may tire more quickly than an individual who has two good eyes. (R. 469.) He stated Plaintiff's monocular vision could cause problems with doing "close work," assembling things, and seeing things coming at him from his right side. (R. 471.) Dr. Deutsch indicated there would be no

---

[7] Mr. Knutson also mentioned the availability of collator and traffic checker jobs. (R. 478.)

reason for an individual with Plaintiff's condition to rest or close his eyes for any length of time during the day. (*Id.*) He testified that even though Plaintiff did not have any exertional limitations as a result of his eye impairment, his diabetes and complications from his diabetes "would limit what he could do exertionally" and these limitations were substantiated by the medical evidence in the record.[8] (R. 469.)

## V.   THE ALJ's DECISIONS

### A.   February 22, 2000 Decision

The ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of his disability. (R. 19.)

The ALJ found that Plaintiff has a limited education and was an individual who was closely approaching advanced age because he was almost fifty years of age. (R. 20.)

The ALJ determined that the medical evidence established that Plaintiff suffers from glaucoma, insulin dependent type II diabetes mellitus and asthma which significantly limits his ability to perform basic work activities; consequently, his impairments are severe. (R. 16, 19.) The ALJ, however, concluded that Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (*Id.*)

---

[8]With regard to Plaintiff's exertional limitations, Dr. Deutsch provided the following testimony:

ALJ:   . . . Now as a result of his impairment would he have any exertional limitations first of all?

ME:   Not because of the glaucoma. I think that the diabetes and the complications of diabetes as he explained would limit what he could do exertionally.

ALJ:   They're substantiated by any medical evidence of record.

ME:   Yeah. (R. 469.)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's residual functional capacity (hereinafter "RFC") to determine what he could do despite his limitations. (R. 17-20.) The ALJ determined that while Plaintiff could not perform his past relevant work and had no transferrable skills, he had the RFC to perform a significant range of medium work. (R. 20.) The ALJ found that Plaintiff was precluded from engaging in work that required: (1) lifting or carrying more than twenty-five pounds frequently and fifty pounds occasionally; (2) sitting for more than about six hours without interruption; (3) standing for more than about six hours without interruption; and (4) walking for more than about six hours without interruption. (R. 20.) The ALJ determined that Plaintiff could not work at unprotected heights or around moving and hazardous machinery which included driving motorized vehicles for work purposes. (*Id.*) The ALJ further found that Plaintiff could not perform jobs requiring good bilateral or peripheral vision and must avoid concentrated exposure to dust and noxious odors or fumes. (*Id.*) In addition, the ALJ concluded that Plaintiff was limited to performing simple, routine tasks. (*Id.*)

The ALJ determined by using Rule 203.19 of the Medical-Vocational Guidelines (the "grid"), as supplemented by the VE's testimony, that Plaintiff could perform a significant number of jobs in the national economy. (R. 20.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 203.19 (2004). Accordingly, the ALJ found that Plaintiff could perform work as a hand packager (5,000 jobs) and bagger (23,000 jobs). (R. 20, 67.)

The ALJ further concluded that Plaintiff's allegations regarding his limitations were not fully credible based on his testimony, his daily activities and the medical evidence. (R. 17, 19.)

Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act. (R. 20.)

## B.    July 18, 2003 Decision

In her July 18, 2003 decision, the ALJ made many of the same factual findings as she had in her February 22, 2000 decision; however, she reached a different conclusion with respect to Plaintiff's RFC. (R. 449.) Specifically, the ALJ found that Plaintiff retained the ability to perform a reduced range of light work. (*Id.*) Accordingly, the ALJ concluded that Plaintiff's impairments precluded him from lifting more than twenty pounds occasionally and ten pounds frequently. (*Id.*)

The ALJ, again, determined that Plaintiff was precluded from engaging in work that required: (1) working around unprotected heights; (2) working with or near dangerous moving machinery; (3) driving motorized vehicles for work purposes; (4) working in environments containing respiratory irritants in concentrated levels; (5) performing work that requires more than monocular vision (i.e., no close work requiring good depth perception, good peripheral vision or fine/detailed work); and (6) performing work requiring more than simple, routine job tasks. (*Id.*)

In the body section of her decision, the ALJ, in assessing whether Plaintiff met listing 12.09 (substance addiction disorders), determined that his mental condition resulted in the following functional limitations under criteria B of this listing: "mild" restrictions in activities of daily living; "mild" difficulties in maintaining social functioning; and "moderate" difficulties in maintaining concentration, persistence or pace. (R. 442.) Plaintiff's mental condition, however, did not cause him to have repeated episodes of decompensation of extended duration. (*Id.*) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.09. Therefore, the ALJ concluded that Plaintiff was not disabled as a result of any mental impairment based on this listing. (*Id.*)

20

The ALJ further determined by using Rules 202.11 and 202.18 of the grid, as supplemented by the VE's testimony, that Plaintiff could perform a significant number of jobs in the national economy. (R. 449.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.11, 202.18 (2004). Accordingly, the ALJ found that Plaintiff could perform the following jobs: housekeeper (6,000 jobs); sales/rental clerk (25,000 jobs); and general clerk/helper (25,000 jobs). (*Id.*)

The ALJ concluded, as she had in her February 22, 2000 decision that Plaintiff's allegations regarding his limitations were not entirely credible and he was not disabled under the terms of the Act. (R. 449.)

## VI. DISTRICT COURT REMAND ORDER

On December 7, 2001, Magistrate Judge Schenkier issued an opinion and order remanding the instant case to address shortcomings in the ALJ's analysis at step five of the sequential evaluation and to further articulate the basis for her credibility finding. *Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850 (N.D. Ill. Dec. 7, 2001). At that time because the ALJ, in her written decision, failed to address and discuss all eight hypothetical questions posed to the VE, Magistrate Judge Schenkier found that "[t]he fundamental problem with the ALJ's determination is that both in the body of her ruling (R. 19) and in her findings (R. 20), she addressed the VE's opinion in response to only one of the hypotheticals– the first one–and disregarded the others." *Id.* at *9. Accordingly, Magistrate Judge Schenkier determined that the ALJ's failure to discuss all eight hypothetical questions contravened Seventh Circuit case law because "[a]n ALJ may not simply select and discuss only that evidence which favors his [or her] ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence." *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)(citations omitted).

The court went on to state that "[t]he ALJ's failure to address the other hypothetical scenarios is particularly problematic in this case, because the opinion of the VE about available work that the ALJ adopted (R. 20, Finding No. 12) was based on a hypothetical that departs from the factual findings that the ALJ made (R. 20, Finding No. 6)." *Sayles*, 2001 WL 1568850, at *9. Specifically, the court stated:

> The ALJ adopted the VE's opinion that there would be 28,000 hand packager and bagger jobs available to a person with the exertional and non-exertional limitations expressed in the first hypothetical, which posited that the individual could not have "concentrated exposure" to driving motorized vehicles for work purposes, or activities involving unprotected heights or being around moving and hazardous machinery. (R. 66-67). However, in her findings, the ALJ determined that [Plaintiff] "cannot" work at unprotected heights around moving and hazardous machinery, which includes driving motorized vehicles for work purposes (R. 20, Finding No. 6). An absolute bar on such activities is obviously a more extreme limitation than a bar which would prevent "concentrated"–but not occasional or periodic–exposure.

> And that is borne out by the VE's opinion about available work in response to the second hypothetical, which asked the VE to accept all assumptions in the first hypothetical, but one: to assume that a person could have "no exposure" (rather than no "concentrated exposure") to unprotected heights or moving and hazardous machinery. With that one change in the scenario, the VE testified that none of the 28,000 bagger and cleaner jobs would be available. (R. 67-68).

> The ALJ offered no explanation for how she could conclude that 28,000 jobs would be available, when her factual findings contain non-exertional limitations which are inconsistent with that conclusion. If that was all that the record disclosed, then a reversal would be in order–but there is more.

> In the third hypothetical, when the ALJ defined "moving and hazardous machinery" to exclude exposure to cars being driven by others in a parking lot, the VE opined that the cleaner and hand packager jobs would be unavailable, but that jobs as a bagger still would be available. (R. 68). This evidence might support a conclusion that there are significant other jobs that [Plaintiff] could perform, but we cannot reach that conclusion on the present record. The ALJ has offered no explanation for excluding moving automobiles from the classification of "moving and hazardous machinery" that [Plaintiff] must avoid. To be sure, the fact that the ALJ concluded that [Plaintiff] may not drive motorized vehicles for work purposes (R. 20) does not automatically mean that [Plaintiff] must avoid exposure to all moving vehicles at the

workplace. Indeed, there is evidence from [Plaintiff's] own testimony that he
regularly rides a bike or walks several blocks on city streets, which one would expect
would require him to negotiate intersections and thus deal with moving cars. But if
the ALJ concluded that [Plaintiff's] limitations did not require him to avoid work that
brought him into some exposure to moving cars, it was incumbent upon the ALJ to
provide at least a "glimpse into [her] reasoning." *Zurawski*, 245 F.3d at 887. Her
failure to do so here warrants reversal and a remand. *Id.* at 9-10.

Accordingly, the court found that the ALJ erred by adopting the VE's opinion based on a

hypothetical that assumed Plaintiff could have some, but not concentrated exposure to heights, and

driving motorized vehicles when the ALJ found, at the same time, that Plaintiff could not work at

unprotected heights or around moving and hazardous machinery which the VE had opined would

preclude Plaintiff from performing any work.

Second, the court noted that the ALJ's decision seemed to be based on various credibility

determinations that were unexplained. *Sayles*, 2001 WL 1568850, at *10. For example, the ALJ

did not address the credibility of Plaintiff's assertions with respect to his non-exertional limitations

which included his need to urinate frequently, his problems with grasping or knocking over items

that were a result of inadequate depth perception, and his inability to focus for more than forty-five

minutes to an hour and then needing to rest his eyes after focusing for about forty-five minutes. *Id.*

The court determined that the credibility of these assertions was critical because the VE expressed

the view that these limitations could preclude or at least impact Plaintiff's ability to work. *Id.* at 8,

10.

The court found that the ALJ's failure to provide any explanation for rejecting Plaintiff's

asserted limitations concerning the frequency with which he must urinate, the extent of his depth

perception problems, and the extent to which he must close and rest his eyes after focusing on an

object for a relatively short period of time was contrary to Seventh Circuit law and remanded the

case on this second, independent basis. *Sayles*, 2001 WL 1568850, at *11. Specifically, the court

stated:

> On remand, we expect that the ALJ will take evidence as needed to eliminate such ambiguities, and will explain her reasoning for credibility determinations that she makes concerning [Plaintiff's] professed limitations, particularly ones that (based on the VE's testimony) may be critical as whether there is available for [Plaintiff] a substantial number of jobs. *Id.* at 11.

Accordingly, on remand, the ALJ was required to provide an adequate explanation with regard to

Plaintiff's above-referenced asserted limitations. *Id.*

## LEGAL STANDARDS

### I.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. §

405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are

supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842

(1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or

substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390.

Conclusions of law, however, are not entitled to deference. Therefore, if the Commissioner commits

an error of law, reversal is required without regard to the volume of evidence in support of the

factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### II.    STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the

Act. *See* 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th

24

Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling (hereinafter "SSR") 96-8p

(1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20

C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to

engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish

that the claimant -- in light of his age, education, job experience and functional capacity to work --

is capable of performing other work and that such work exists in the national economy. *See* 42

U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal of the ALJ's decision that he is not disabled and an award of SSI

benefits, or, alternatively, he requests that the case be remanded based on numerous errors made by

the ALJ.

## I.    THE LAW OF THE CASE DOCTRINE

### A.    Step Five Analysis

Plaintiff initially seeks reversal of the ALJ's decision that he is not disabled asserting that he

is entitled to an award of benefits based on the ALJ's failure to follow the law of the case doctrine.

Plaintiff avers that the ALJ failed to comply with the law of the case doctrine because she did not

follow Magistrate Judge Schenkier's December 7, 2001 remand order which mandated that she

address the shortcomings in her step five analysis. (Pl.'s Mem. at 9-12; Pl.'s Reply at 1-7.) *Sayles*,

2001 WL 1568850, at *8-10. Specifically, with regard to the ALJ's shortcomings in her step five

analysis, Plaintiff contends that the ALJ went beyond the scope of the remand order by eliciting

additional testimony from a second VE (Mr. Knutson) regarding the availability of jobs based on a

light exertional level when the case was remanded only for the ALJ to address specific issues. (Pl.'s

Mem. at 9-10.) For instance, Plaintiff asserts that the principal reason the case was remanded was so that the ALJ could clarify why she excluded moving automobiles from the definition of "moving and hazardous machinery" in the third hypothetical question which left bagger jobs (23,000) available that Plaintiff could perform. (*Id.* at 9-10; Pl.'s Reply at 1-2.) *Sayles*, 2001 WL 1568850, at *10 ("In the third hypothetical, . . . the ALJ defined "moving and hazardous machinery" to exclude exposure to cars being driven by others in a parking lot . . . The ALJ has offered no explanation for excluding moving automobiles from the classification of "moving and hazardous machinery").

Plaintiff further argues that based on the second VE's testimony (Mr. Knutson) the ALJ seemingly decided, without explanation, that Plaintiff could not perform the work of bagger because it included a limitation to not working around moving automobiles. (Pl.'s Mem. at 10.) Plaintiff thus contends that once the VE's testimony was clarified the matter should have ended and the ALJ violated the law of the case given her obduracy in failing to follow the remand order and eliciting additional testimony on available jobs Plaintiff could perform despite the fact, at the first administrative hearing, nine different hypothetical questions were posed to the initial VE (Ms. Hoiseth) to which she provided a complete analysis of those hypothetical questions. (Pl.'s Reply at 2-3.) Plaintiff therefore avers that whether there were additional jobs that Plaintiff could perform was not an issue that was left open on remand and, moreover, the ALJ provided no basis for departing from the principles set forth in the December 7, 2001 remand order. (Pl.'s Mem. at 10-11; Pl.'s Reply at 3.) Accordingly, Plaintiff asserts that he is disabled and entitled to an award of benefits based on the VE's testimony that he cannot perform the bagger work. (Pl.'s Mem. at 11-12.)

Defendant, on the other hand, asserts that the ALJ complied with Magistrate Judge Schenkier's remand order because she reassessed Plaintiff's limitations as she was ordered to do by

the court by eliciting testimony from a qualified VE (Mr. Knutson) and ME as well as additional testimony from Plaintiff. (Def.'s Mem. at 8, 10.) Based upon this additional evidence, Defendant avers that the ALJ reconsidered Plaintiff's RFC and determined that he was capable of performing a reduced range of light work (R. 449) rather than a significant range of medium work (R. 20). (*Id.*) Therefore, Defendant contends that the ALJ did comply with Magistrate Judge Schenkier's remand order and based on the new RFC finding, the VE (Mr. Knutson) identified a significant number of jobs that Plaintiff could perform. (*Id.*)

The law of the case doctrine states that "[o]nce an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991). This doctrine precludes an ALJ on remand from reexamining issues that were implicitly left intact by the reviewing court on judicial review of the Commissioner's decision. *See e.g., Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). As the Seventh Circuit has explained the law of the case doctrine "requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Id.*

"[T]he question of whether the Secretary violated the law of the case on remand is best answered by carefully considering the scope of the district court's remand order." *Key*, 925 F.2d at 1061. The Seventh Circuit has stated that "[t]he reason for this examination is that the law of the case doctrine comes into play only with respect to issues previously determined." *Id.* The law of the case doctrine "'most often applies to issues already fully decided in cases that subsequently re-appear before the rendering court.'" *Id.* (*quoting The Trustees of Indiana Univ. v. The Aetna Casualty & Surety Co.*, 920 F.2d 429, 435 (7th Cir. 1990))(overruled on unrelated grounds by *Watson v. Amedco*

*Steel, Inc.,* 29 F.3d 274)(7th Cir. 1994)). Therefore, [i]f an issue is left open after remand, the lower

tribunal is free to decide it." *Id.* (*citing* C. Wright, A. Miller, E. Cooper, 18 Federal Practice &

Procedure § 4478 (1981)).[9]

The Court finds that the ALJ complied with Magistrate Judge Schenkier's December 7, 2001

remand order as it relates to addressing the shortcomings in her step five analysis. The ALJ complied

with the remand order because, at the supplemental administrative hearing held on March 6, 2003,

the ALJ elicited additional testimony from a second VE (Mr. Knutson)[10] to clarify whether an

individual such as Plaintiff, who has limited peripheral vision on the right side, could perform the

bagger work. (R. 474.) Mr. Knutson provided the following testimony:

> ALJ: Part of the problem we had with similar jobs that were given last time is the
> proximity to moving cars and doing probably either one of those jobs, a
> bagger if he had to carry thing[s] out to a parking lot. And I assume a package
> porter would be doing the same thing. Is that correct?
> VE: That is correct.
> ALJ: Okay. So with the hypothetical I gave you, with the limited peripheral vision,
> no peripheral vision basically from the right and not the limitations on the
> moving machinery would the person still be able to perform those jobs?
> VE: No, I think when you think the fact the bagger may have to walk out to a
> parking lot. And certainly a porter is around moving vehicles they would not
> fit. (R. 474.)

---

[9]The law of the case doctrine has its exceptions. A previously decided determination is
not applicable is there are reasons rendering the doctrine inapplicable. These would include: "(1)
substantial new evidence introduced after the first review, (2) a decision of the Supreme Court
after the first review, and (3) a conviction on the part of the second reviewing court that the
decision of the first was clearly erroneous." *Key v. Sullivan,* 925 F.2d 1056, 1060 (7th Cir. 1991).

[10]Plaintiff avers that the ALJ should have recalled Ms. Hoiseth, the first VE, to testify at
the supplemental hearing held on March 6, 2003 because the remand order dealt specifically with
her testimony. (Pl.'s Mem. at 10.) Plaintiff's contention, however, is unavailing because he has
provided no legal authority which would entitle him to recall the same VE at a hearing upon
remand.

Thus, Mr. Knutson stated that Plaintiff could not perform the bagger job and while the ALJ never directly addressed the issue of whether moving automobiles were classified as "moving and hazardous machinery" which would preclude the bagger work (23,000 jobs), the ALJ concluded that Plaintiff could not perform the bagger work. (R. 449, par. 11.) Accordingly, the ALJ followed the December 7, 2001 remand order by eliciting additional testimony from a VE and clarifying whether Plaintiff could perform the bagger work.

Plaintiff asserts, however, that once the ALJ found that he could not perform the bagger work, the matter should have ended and the ALJ then essentially violated the law of the case doctrine by eliciting additional testimony from the second VE (Mr. Knutson) on available jobs he could perform based on a light exertional level (rather than a medium level)[11] despite the fact that, at the initial administrative hearing, nine different hypothetical questions were posed to the initial VE (Ms. Hoiseth) to which she provided a complete analysis of those hypothetical questions. (Pl.'s Reply 2-3.) In asserting his position, Plaintiff principally relies on *Key*.[12] In *Key*, the claimant argued that the Secretary had violated the law of the case doctrine by improperly enlarging her RFC from "sedentary to light" without new evidence that her condition had improved and reassessing her past relevant work and concluding that it included other jobs (in addition to that of assembler). *Key*, 925 F.2d at 1060-61. The Seventh Circuit, in finding that the law of the case doctrine had been violated, stated:

> To determine which issues were left open in this case, a bit of retracing is in order. In his November 13, 1984, recommended decision, ALJ Kortsch found that Key's

---

[11]It bears noting that if an individual is capable of doing medium work, he or she can also do sedentary and light work. 20 C.F.R. § 416.967(c).

[12]Defendant does not address *Key* in its responsive brief.

past relevant work was that of bench assembly, and that this work required only sedentary activities. This finding became part of the final decision of the Secretary. Apparently, the district court reached the same conclusion about Key's past relevant work, because it stated that "the ALJ failed to define the physical exertion required of an *assembler*." *Key v. Sullivan*, slip. op. at 9 (E.D. Wis. Sept. 16, 1986). (Emphasis provided). In the language of *Angevine*, the district court "explicitly or by necessary implication," 881 F.2d at 521, affirmed the Secretary's prior determination that Key's past relevant work was that of assembler. The whole point of the remand was to allow the Secretary to make a finding as to the physical and mental demands of the assembler job in relation to Key's present capabilities. After ALJ Kortsch found that Key's present capabilities would not allow her to perform her past assembly job, the inquiry was expanded to evaluate whether she could perform any other past relevant work or other work in the national economy. By then, Key's past relevant work and her residual functional capacity were not open issues, and the Secretary was not free to disregard the narrow remand directions of the district court. There were no unusual or compelling reasons cautioning against application of the law of the case doctrine, and none of [the] exceptions noted in *North Western Transportation* applied. The Secretary clearly exceeded the scope of the remand order, and violated the law of the case. *Key*, 925 F.2d at 1061.

The Seventh Circuit concluded:

The Secretary failed in his burden of proving by substantial evidence in the record that Key is not disabled and that she can perform parts of her past work as well as other jobs in the national economy. We agree with the district court that, after so many years of hearings, rehearings, and appeals, no useful purpose would be served by delaying Key's receipt of benefits. *Key*, 925 F.2d at 1063.

The Court finds that *Key* is distinguishable from the instant case because, in *Key*, the ALJ and Appeals Council addressed specific issues (the claimant's RFC and past relevant work) which had already been decided and were not left open on remand. Herein, however, the issue of whether Plaintiff could perform the bagger work was specifically left open for the ALJ to address in a supplemental proceeding. The ALJ did address this issue and determined that Plaintiff was not capable of performing the bagger work due to his visual impairments. The ALJ then went on to consider the broader issue of whether Plaintiff was disabled and determined he could perform light-

level work after reassessing his RFC. Thus, because Magistrate Judge Schenkier's remand order was broad enough to leave open the issue of whether there were other jobs in the national economy that Plaintiff could perform and there was no language in the remand order which would preclude further inquiry regarding this matter, the ALJ properly found that Plaintiff could perform work as a housekeeper (6,000 jobs), sales/rental clerk (25,000 jobs) and general clerk/helper (25,000). (R. 449.)

Plaintiff next asserts that *Wilder* is applicable herein given the ALJ's obduracy in following Magistrate Judge Schenkier's remand order. For example, the Seventh Circuit, in *Wilder*, automatically awarded disability insurance benefits to the claimant because of the obduracy evidenced by the Social Security Administration. *Wilder*, 153 F.3d at 804. In *Wilder*, the Seventh Circuit, which had previously remanded the case, reviewed the district court's decision to affirm the Commissioner's denial of benefits, found no reasoned basis for the denial, and reversed the district court's ruling. *Id.* The Seventh Circuit did not find that the record yielded one supportable conclusion, but rather found that the new evidence "left the case exactly where it was the last time." *Id.* Nonetheless, the Seventh Circuit refused to remand the case to the Commissioner for further proceedings and, in reaching its decision, pointed to the actions of the agency. *Id.* at 801, 804. The ALJ's opinion, the Seventh Circuit stated, was no more reasoned than the one that resulted in the remand, contained misstatements of evidence, ignored the instructions from the court's previous remand order, and relied on evidence not in the record. *Id.* at 802-04. Thus, in order "to bring the charade to an end," the Commissioner was ordered to award the claimant benefits for which she had applied. *Id.* at 801.

32

The Court finds that *Wilder* is inapplicable herein because as discussed *supra* the ALJ followed Magistrate Judge Schenkier's December 7, 2001 remand order by eliciting additional testimony from a VE to clarify whether Plaintiff could perform the bagger work. Thus, while the ALJ never explicitly addressed the issue of whether moving automobiles were classified as "moving and hazardous machinery," she concluded that Plaintiff could not perform the bagger work because he cannot work around moving automobiles. Accordingly, the ALJ cannot be viewed as being obdurate in refusing to follow the remand order and appropriately concluded that while Plaintiff could not perform medium-level work as a bagger, he could perform work at the light-level which existed in significant numbers in the national economy. .

Plaintiff further relies on *DeFrancesco v. Sullivan*, 794 F.Supp. 282 (N.D. Ill. 1992) asserting that it was essentially erroneous for the ALJ to consider whether he could perform light work once the ALJ found that he could not work around moving cars which precluded the medium-level bagger work. (Pl.'s Reply at 3-4.) In *DeFrancesco*, the district court stated:

> The Secretary found, in his March 10 ruling, that the grid requires a finding that DeFrancesco was disabled at age 50. DeFrancesco had reached that age at the time of the Seventh Circuit opinion (by then DeFrancesco had already passed away at age 52), and the appeals panel may not have realized that part of DeFrancesco's claim covered a roughly two-year period before he turned fifty. On the other hand, this court must presume that the Seventh Circuit was aware of the full record and that its findings accurately reflect the record and the grid. The appeals opinion discusses DeFrancesco's claim as a whole, without any subparts, and clearly states that "sedentary" work is out of the case; DeFrancesco's claim depended only on the extent of "light work" he could perform. [*DeFrancesco v. Bowen*, 867 F.2d 1040, 1042, 1045 (7th Cir. 1989)].

> The remand order directing the Secretary to get his ALJs "off their grids," [*DeFrancesco*, 867 F.2d at 1045], therefore pertained only to "light work." Because "sedentary" capability had already been deemed irrelevant, there was no need for the Seventh Circuit to state whether the grids should be applied to "sedentary work."

The Appeals Council found in its March 10 ruling that DeFrancesco could not perform any "light work." That should have ended the matter; DeFrancesco's claim should have been accepted in full. Accordingly, the court finds that the Secretary applied an erroneous legal standard, reverses the Secretary's March 10 ruling and enters summary judgment for Mrs. DeFrancesco

Additionally, the court finds that the Secretary improperly rejected medical and vocational evidence showing that DeFrancesco would not have been able to perform a wide range of "sedentary" jobs. *DeFrancesco*, 794 F.Supp. at 285-86.

The Court finds that *DeFrancesco* is distinguishable from the case at bar because unlike here, the remand order in *DeFrancesco* explicitly stated that sedentary work was "out of the case" and the claimant's claim depended only on whether he could perform light work. *DeFrancesco*, 794 F.Supp. at 285-86. Ultimately, because the Seventh Circuit determined sedentary work was irrelevant and the Secretary had improperly rejected medical and vocational evidence indicating that the claimant would not have been able to perform sedentary work, summary judgment was entered in favor of Mrs. DeFrancesco. *Id.* at 286. Herein, however, as discussed *supra*, Magistrate Judge Schenkier's remand order was not so narrowly constructed as to preclude the ALJ from questioning the second VE (Mr. Knutson) with regard to other jobs Plaintiff could perform based on a different exertional level (light rather than medium). Accordingly, once the ALJ found that Plaintiff could not perform the bagger work at the medium level, he was free to inquire about other work Plaintiff could perform because Magistrate Judge Schenkier's remand order did not specifically preclude this type of inquiry or state that light work was irrelevant or not to be considered.

Therefore, given the scope of the December 7, 2001 remand order with regard to the step five analysis as well as the fact that there was no compelling reason to depart from it, the ALJ properly complied with the remand order with regard to this issue. *See e.g., Wilder*, 153 F.3d at 803. Accordingly, a reversal and award of benefits is not warranted.

## B.     Credibility Determination

Plaintiff next contends that the ALJ erred by failing to follow the law of the case doctrine because she did not further articulate the basis for her credibility determination as stipulated by Magistrate Judge Schenkier's December 7, 2001 remand order. (Pl.'s Mem. at 15-16.) *Sayles*, 2001 WL 1568850, at *10-11. Specifically, Plaintiff asserts that the ALJ did not address his testimony concerning his limitations regarding the frequency with which he must urinate, the extent of his inadequate depth perception which causes problems in grabbing or knocking over items, and the limits on his ability to focus his eyesight and the need to close and rest his eyes after focusing for a relatively short period of time. (*Id.*) *Sayles*, 2001 WL 1568850, at *11. Accordingly, Plaintiff avers that the ALJ did not follow the law of the case doctrine because she failed to articulate the basis for her credibility determination with regard to these asserted limitations as mandated in Magistrate Judge Schenkier's remand order. (*Id.*)

Defendant, on the other hand, provides no argument or response to Plaintiff's assertion that the ALJ violated the law of the case doctrine by failing to further articulate her credibility determination as mandated by Magistrate Judge Schenkier in his December 7, 2001 remand order.[13] (*See* Def.'s Mem.)

With regard to that portion of Magistrate Judge Schenkier's remand order mandating that the ALJ further articulate her credibility determination, the Court finds that the ALJ violated the law of the case doctrine because she failed to fully comply with the remand order with respect to this issue. Specifically, Magistrate Judge Schenkier ordered the ALJ to address Plaintiff's testimony concerning his limitations regarding the frequency with which he must urinate, the extent of his inadequate depth

---

[13]Defendant's only contention is that the ALJ noted that there was no medical basis for Plaintiff's alleged need to rest his eyes during the day. (Def.'s Mem. at 12.)

perception which causes problems in grasping or knocking over items, and the limits on his ability

to focus his eyesight and the need to close and rest his eyes after focusing for a relatively short period

of time. (*Id.*) *See Sayles*, 2001 WL 1568850, at *11. The ALJ, however, failed to fully address all

of these asserted limitations in her July 18, 2003 decision.[14] (*See* R. 440-50.) Therefore, a remand

on this issue is warranted.

The Court finds that even though the ALJ complied with the December 7, 2001 remand order

with regard to her step five analysis, she also expanded the scope of Magistrate Judge Schenkier's

remand order by eliciting additional testimony from Plaintiff, soliciting testimony from an ME and

reassessing Plaintiff's RFC which resulted in a determination that he could perform light work rather

---

[14]The ALJ found that the medical evidence did not support Plaintiff's allegations of
disabling symptoms and limitations. (R. 443, 445.) With respect to Plaintiff's need to rest his
eyes and his inadequate depth perception problem which causes him problems with grasping for
items, the ALJ after considering the ME's testimony, stated in her decision: "His visual acuity
may decline with prolonged use, and he may tire more quickly than someone with good vision,
but this is subjective, with no objective evidence of this in the record. There is no medical or
organic reason for resting the eyes during the day. The claimant may have problems with close
work, picking up objects, reaching for something, pouring a cup of coffee, or assembling things,
like putting wires together." (R. 445.) The Court finds that while the ALJ addressed these two
issues, she erred with her conclusion regarding Plaintiff's need to close and rest his eyes for
periods of time. Specifically, the ME stated that while there was no medical or organic reason for
Plaintiff's claim that he tires with prolonged use of his good eye (i.e., left eye), the ME testified
that Plaintiff "may tire a little more quickly than somebody with two good eyes. It[] . . . would
be subjective" (R. 469) and he has heard other individuals with monocular vision state that they
tire more quickly. (R. 470.) Moreover, the ME stated that Plaintiff's visual acuity had been
tested for distance, but not "over a period of time." (R. 470.) Accordingly, the ALJ erred when
she determined Plaintiff's subjective complaints of needing to rest and close his eyes were not
credible based on the medical evidence in the record. The ALJ thus needs to clarify these
inconsistences in her credibility determination on this point.

With regard to Plaintiff's need to frequently urinate, the ALJ stated that "He does not
sleep well because he has to get up to urinate every hour on the hour." (R. 443.) The ALJ,
however, never assessed Plaintiff's credibility with regard to this issue and failed to explain
whether she credited or discredited his testimony regarding his frequency of urination as ordered
by Magistrate Judge Schenkier.

than medium work. Because the ALJ essentially went beyond the scope of Magistrate Judge Schenkier's remand order, Plaintiff avers that she committed additional errors which require remand. Accordingly, Plaintiff contends *inter alia* that: (1) the ALJ failed to incorporate Plaintiff's mental impairment in the hypothetical question posed to the VE; (2) the ALJ erred in her RFC finding that Plaintiff could perform a limited range of light work because she failed to develop a full and fair record with regard to his standing and walking limitations; and (3) the ALJ's credibility determination was erroneous and insufficient as a matter of law. (*See* Pl.'s Mem. & Reply)

## II.   MENTAL IMPAIRMENT ISSUE

Plaintiff asserts that the ALJ failed to include his mental impairment in the hypothetical question she posed to the VE at the March 6, 2003 administrative hearing. (Pl.'s Mem. at 12.) Specifically, Plaintiff avers that the ALJ found that he had moderate difficulties in maintaining concentration, persistence or pace (R. 442); however, she did not include these limitations in her hypothetical question or in the findings portion of her decision. (*Id.*) Accordingly, Plaintiff contends the ALJ erred by failing to incorporate his mental impairment in the hypothetical question. (*Id.*)

Defendant, on the other hand, presents no argument in response to this issue. (*See* Def.'s Mem.)

The case of *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003) is instructive on this issue. In *Kasarsky*, the ALJ found that the claimant suffered from frequent deficiencies of concentration, persistence or pace; however, the ALJ failed to include these limitations in the hypothetical question. The hypothetical question posed to the VE reflected only the ALJ's finding about Kasarsky's RFC, which read as follows:

> I find that the claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of light work, not requiring more than occasional bending, squatting, and kneeling, any scaffold or ladder climbing, or any

frequent overhead reaching. Because of borderline intelligence, the claimant is serious[ly] limited, but not precluded from understanding, remembering, and carrying out detailed instructions. *Kasarsky*, 335 F.3d at 544.

The Seventh Circuit went on to state:

> We see nothing in this description, however, that takes into account the ALJ's own earlier observation (both in his opinion and [Psychiatric Review Technique Form]) that Kasarsky suffered from frequent deficiencies of concentration, persistence, or pace. It is possible, of course, that there is an explanation for this omission. Perhaps the ALJ thought that even with frequent deficiencies of this type, Kasarsky could still carry out detailed instructions in a way that would satisfy a potential employer. But we have no way of knowing that, and it is equally possible that [the VE] might have found that there were no jobs for someone with (a) limited exertional abilities, (b) borderline intelligence *and* (c) frequent deficiencies of concentration, persistence or pace. *Kasarsky*, 335 F.3d at 544.

Accordingly, because the ALJ failed to incorporate the claimant's limitation with regard to frequent deficiencies of concentration, persistence, or pace which were fully supported by the record in the hypothetical questions he posed to the VE or explain its omission, the Seventh Circuit remanded the case. *Id.*

Similarly, herein, the ALJ failed to incorporate Plaintiff's mental impairment related to his moderate difficulties in maintaining concentration, persistence or pace into the hypothetical question (and its variations) she posed to the VE.[15] (*See* R. 472-76.) Accordingly, a remand on this issue is warranted. *See also Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)("Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record.")

---

[15]The ALJ apparently found that Plaintiff had greater limitations as a result of his mental impairment than Dr. Hermsmeyer (state agency reviewing psychologist). (R. 256.) For instance, Dr. Hermsmeyer opined that Plaintiff "seldom" had deficiencies of concentration, persistence or pace (R. 256); whereas, the ALJ found that Plaintiff had "moderate" difficulties in maintaining concentration, persistence or pace. (R. 442.) Dr. Hermsmeyer, however, determined that Plaintiff was "moderately limited" in his ability to carry out detailed instructions. (R. 258.)

## III. RESIDUAL FUNCTIONAL CAPACITY ISSUE

Plaintiff contends that the ALJ's RFC assessment was insufficient because she failed to adequately develop the record with regard to the exertional limitations caused by his diabetes. (Pl.'s Mem. at 13-14.) Plaintiff initially avers that his most recent physical examination (other than for his eye impairments) took place in February of 1999 (R. 241-45) and, at that examination, it was noted that he suffers from foot ulcers caused by his diabetes. (*Id.* at 13; R. 242.) Next, Plaintiff points out, that at the December 16, 1999 administrative hearing, he testified he could only stand for about an hour because his feet and legs tire (R.51, 56), could only walk about two blocks (R. 50), and had achy feet because of his foot ulcers.[16] (*Id.*; R. 49, 56.) Plaintiff also contends that, as evidenced by his testimony at the March 6, 2003 administrative hearing, he sought emergency room treatment at Evanston Hospital due to poor circulation in his feet that resulted in his right foot aching and his big toe turning black which was caused by his diabetes. (*Id.*; R. 458-59.) Accordingly, Plaintiff avers that in light of the medical evidence of his diabetes and foot ulcers, his testimony concerning his standing and walking limitations, and the ME's testimony that his diabetes would "limit what he could do exertionally" (R. 469), the ALJ should have further developed the record by ordering additional medical evaluation(s) such as a consultative evaluation to ascertain his condition as it related to his diabetes.[17] (*Id.* at 13-14.)

---

[16]During a consultative examination on September 25, 1998, Plaintiff reported to Dr. Gordon that he could walk two blocks, go up a flight of stairs and do light activity without difficulty. (R. 168, 444.) Moreover, in a daily activities telephone report dated January 21, 1999, Plaintiff stated he can walk to the store which is about one-half a block from his residence, however, he does not like to go any farther because he cannot see too well and becomes very tired. (R. 150, 443.)

[17]It also bears noting that Plaintiff was not seeking medical treatment because he was not
(continued...)

Defendant, on the other hand, avers that the record contains ample medical evidence concerning Plaintiff's impairments. (Def.'s Mem. at 14.) Defendant thus contends that Plaintiff is merely speculating that additional medical expert testimony would produce a different result which is an insufficient basis for a court to grant a remand. (*Id.*) Moreover, Defendant asserts that because Plaintiff's attorney did not object to the accuracy or completeness of the record and he never requested additional medical evaluations, this issue has been waived.[18] (*Id.*)

Although a claimant has the burden of proving disability, "the ALJ has a duty to develop a full and fair record." *Smith,* 231 F.3d at 437. *See also Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir.1991)(*quoting Smith v. Secretary of Health, Education and Welfare,* 587 F.2d 857, 860 (7th Cir. 1978)("[i]t is a basic obligation of the ALJ to develop a full and fair record."). Failure to fulfill this obligation is good cause to remand for gathering of additional evidence. *Smith,* 231 F.3d at 437. How much evidence to gather is a subject on which the court "generally respect[s] the [ALJ's] reasoned judgment." *Smith,* 231 F.3d at 443 (*quoting Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir. 1994)). "If the ALJ is able to weigh the record evidence and determine whether the claimant is disabled based on that evidence, then he is not required to obtain additional evidence." *Smith,* 231 F.3d at 443.

---

[17](...continued)
receiving public assistance and did not have a medical card. (R. 455-58.)

[18]Defendant cites to *Brewer v. Chater,* 103 F.3d 1384 (7th Cir. 1997) for the proposition that Plaintiff has waived his right to object to the accuracy or completeness of the record because he did not raise any objections to this particular issue. (Def.'s Mem. at 14.) The Court, however, finds Defendant's argument unavailing because the Seventh Circuit overruled *Brewer* on the waiver issue in *Johnson v. Apfel,* 189 F.3d 561 (7th Cir. 1999).

The Court finds that the ALJ erred in her RFC assessment of Plaintiff because she failed to develop a full and fair record with regard to the exertional limitations caused by his diabetes. For instance, a review of the administrative record demonstrates that almost all of the medical evidence in the record pertains to Plaintiff's non-exertional limitations related to his visual impairment(s) and there is sparse medical evidence assessing any exertional limitations Plaintiff may experience as a result of his diabetes and/or complications from his diabetes. Moreover, at the time of the second administrative hearing on March 6, 2003, the most recent medical examination assessing Plaintiff's diabetes (R. 241-45) which indicated he suffered from foot ulcers (R. 242) was more than four years old.[19] Therefore, given that there is outdated and inadequate medical evidence contained in the record indicating Plaintiff has certain exertional limitations caused by his diabetes (R. 242), Plaintiff's emergency room treatment for poor circulation in his feet in early March of 2003 due to his diabetes (R. 458-59), Plaintiff's testimony that he could only stand for about one hour and walk about two blocks (R. 50-51)[20], and the ME's testimony that Plaintiff's diabetes and the complications

_____

[19]It also bears noting that two state agency reviewing physicians (Drs. Kenney and McCracken) opined that Plaintiff could stand and/or walk for about six hours in an eight-hour workday. (R. 173, 263.) Dr. Kenney also noted that Plaintiff had "no complications" from his diabetes. (R. 173.) These physicians, however, never examined Plaintiff; rather, they merely reviewed his medical file. (R. 172-79, 262-69.) *See e.g.,* 20 C.F.R. § 416.927(d)(1) (more weight is given to the opinion of a physician who has examined the claimant than to one who did not examine the claimant). *See also Allen v. Weinberger,* 552 F.2d 781, 786 (7th Cir. 1977)(citation omitted)(With regard to the conclusions of physicians who merely reviewed the plaintiff's medical file and performed no examinations, the court stated: ". . . the weight to be attached to the reports must be considered in light of the fact that neither physician examined the plaintiff . . . . Their reports, without personal examination of the claimant, deserve little weight in the overall evaluation of liability. The (medical) advisers' assessment of what other doctors find is hardly a basis for competent evaluation.") Accordingly, Drs. Kenney and McCracken's opinions are entitled to little weight.

[20]In view of Plaintiff's testimony regarding his standing and walking limitations (R. 50-51, 150, 168, 443, 444) as well as the ME's testimony that Plaintiff's diabetes and the

from his diabetes "would limit what he could do exertionally"[21] (R. 469), the ALJ should have

ordered additional medical examination(s) and evaluation(s) to assess any exertional limitations;

including Plaintiff's standing and walking limitations caused by his diabetes.[22] *See* 20 C.F.R. §

---

complications from his diabetes "would limit what he could do exertionally" and that these limitations are substantiated by the medical evidence (R. 469), Plaintiff may be limited to performing sedentary work. *See e.g.,* 20 C.F.R. § 416.967(a)("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.") *See also SSR* 83-10, 1983 WL 31251 (S.S.A. 1983)("Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.") Accordingly, on remand, the ALJ is instructed to reassess Plaintiff's RFC to determine if he is limited to sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.01, 201.02, 201.09, and 201.10 (2004).

[21]It also bears noting that because the ME testified that Plaintiff's exertional limitations were substantiated by the medical evidence (R. 469), the ALJ should have further developed the record with regard to Plaintiff's standing and walking limitations to determine if he is disabled.

[22]"The RFC assessment is a function-by-function assessment based upon all the relevant evidence of an individual's ability to do work-related activities." *SSR* 96-8p, 1996 WL 374184, *3 (S.S.A. July 2, 1996). Moreover, "[e]xertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately." *Id.* at *5.

*SSR* 96-8p further provides, in pertinent part:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were

416.919a(2)(b)(1),(4)(some kinds of cases do "normally require a consultative examination," including those in which "additional evidence needed is not contained in the records of [the claimant's] medical sources," and those involving an "ambiguity or insufficiency in the evidence [that] must be resolved."); *see also Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997)("[A] consultative examination is often required for proper resolution of a disability claim.")

Accordingly, because there was insufficient medical evidence in the record for the ALJ to properly access Plaintiff's RFC and make a determination as to whether Plaintiff is disabled, a remand on this issue is warranted.[23] *See e.g., Smith*, 231 F.3d at 437 (the ALJ has a duty to develop a full and fair record including the ordering of any additional medical evidence necessary to make a disability determination.) *See also Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)(*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)(an ALJ must build an "accurate and logical bridge from the evidence to his conclusion.")

---

considered and resolved. *Id.* at *7.

Accordingly, on remand, the ALJ is instructed to comply with SSR 96-8p when reassessing Plaintiff's RFC.

To digress, an important point is there's no evidence in the record that describes the duties of the light work jobs (housekeeper, sales, rental clerk, and general clerk/helper) the ALJ found that the plaintiff was capable of performing. Because the ALJ found plaintiff could perform "no close work" the ALJ, on remand, needs to assess whether plaintiff could perform these jobs, because they would entail "close work" requiring good depth perception, good peripheral vision and fine detailed work (R. 449).

[23]Because the medical evidence in the case is at least four years old, the ALJ is instructed to obtain updated and current medical examination(s) and evaluation(s) in order to reassess the nonexertional limitations caused by Plaintiff's eye impairment(s).

## IV.    CREDIBILITY DETERMINATION

Plaintiff argues that the ALJ's credibility determination was erroneous and insufficient as a matter of law because she failed to follow the requirements of *SSR* 96-7p and relevant case law in making her determination. (Pl.'s Mem. at 16-19; Pl.'s Reply at 7-9.) Plaintiff thus avers that the ALJ erred when she found Plaintiff not credible based on his failure to obtain regular medical treatment and his limited daily activities. (*Id.*)

Defendant, on the other hand, asserts that the ALJ properly followed the mandates of *SSR* 96-7p in assessing Plaintiff's credibility. (Def.'s Mem. at 11-13.) Defendant first contends that the ALJ found that Plaintiff was not credible because his subjective complaints were inconsistent with the medical evidence in the case and, moreover, the ALJ noted that there was no medical basis for Plaintiff's alleged need to rest his eyes during the day. (*Id.* at 12; R. 445.) Defendant further asserts that the ALJ considered Plaintiff's lack of medical treatment during a four year period (from 1999 through 2003) and the lack of emergency room visits as evidence that his symptoms were not as severe as he alleged. (*Id.* at 12-13; R. 445-46.) Defendant also avers that the ALJ found Plaintiff's testimony not credible because the treatment he received was routine in nature and not the type of treatment one would expect for a totally disabled individual. (*Id.* at 13; R. 446.) Moreover, Defendant contends that the ALJ considered Plaintiff's testimony that he shared insulin with a friend and only required insulin shots twice a week as well as his daily activities; namely, that he went to the barbershop, socialized and watched television all day long in finding that he was not credible regarding his asserted limitations. (*Id.* at 13; R. 446-47.)

An ALJ's credibility determination will not be overturned by a court unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "A credibility assessment is afforded

special deference because an ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)(*citing Powers*, 207 F.3d at 435). It is well-established, however, that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003)(*quoting* Social Security Ruling 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996)); *Lopez,* 336 F.3d at 539-40; *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003). Where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).

## A. Medical Treatment

With regard to Plaintiff's lack of medical treatment, *SSR* 96-7p is applicable in Plaintiff's favor and provides in pertinent part:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. *SSR* 96-7p, 1996 WL 374186, at *7.

Moreover, SSR 96-7p sets forth examples for why a claimant may chose not to seek medical treatment; such as, "the individual's daily activities may be structured so as to minimize symptoms

to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms . . . [or that] the individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id.* at 8.

The Court finds that the ALJ erred when she found Plaintiff not credible based on his lack of medical treatment and emergency room visits during the four year period from 1999 through 2003 (R. 445-46) because he testified that he did not have a medical card and did not know that he could receive free medical treatment for his impairments. (R. 462-63.) Plaintiff provided the following testimony at the March 6, 2003 administrative hearing regarding his medical treatment:

> ALJ:     Mr. Sayles, why aren't you getting some treatment for your eyes or for your other conditions?
> Sayles:  Because I don't have [a] medical card.
> ALJ:     Well, you realize you could go to Cook County and be treated for free, don't you?
> Sayles:  Cook County?
> ALJ:     Cook County Hospital, . . .
> Sayles:  What . . . in Chicago?
> ALJ:     Yes. You live in Cook County?
> Sayles:  [Yes].
> ALJ:     Didn't you realize you could go there and get some free treatment?
> Sayles:  No.[24] (R. 462-63.)

Based on Plaintiff's testimony, the ALJ violated the requirements of *SSR* 96-7p when she concluded that Plaintiff's allegations regarding his limitations were not credible because he had a "good reason" for not seeking regular medical treatment and/or emergency room treatment which the ALJ apparently failed to consider. In addition, given Plaintiff's testimony that he does not have a

---

[24]At the March 6, 2003 administrative, the ALJ asked Plaintiff why it took him so long to get around to seeking medical treatment and public assistance to which Plaintiff responded, "I don't know." (R. 463.) A review of the record, however, demonstrates that Plaintiff did not know he could get free medical treatment (R. 462-63) and he did not think he could not get public or township assistance because he did not have a permanent address. (R. 457-58.)

permanent place of residence or permanent address (R. 456-57), he was unable to receive township

assistance because he does not have a permanent address (R. 457-58), and family members would

no longer provide housing for him because he does not have a source of income (R. 458), the ALJ's

negative inference regarding Plaintiff's lack of medical treatment was unfounded. It further bears

noting Plaintiff testified that he would be seeking treatment for his conditions.[25] (R. 259-60).

Accordingly, a remand on this issue is warranted.[26]

## B.  Daily Activities

With regard to Plaintiff's daily activities, at the December 16, 1999 administrative hearing,

he testified he spent his time at the corner store and barber shop visiting with other men who also

---

[25]Defendant contends that the ALJ found Plaintiff not credible because his subjective complaints were inconsistent with the medical evidence in the case. (Def.'s Mem. at 12.) The Court finds Defendant's argument unavailing because, as discussed in Section III of this opinion, the ALJ failed to adequately develop the record with respect to Plaintiff's exertional limitations.

In addition, Defendant asserts that the ALJ found Plaintiff's testimony not credible because the treatment he has received was essentially routine in nature and "not generally the type of medical treatment one would expect for a totally disabled individual." (R. 446.) Moreover, the ALJ noted that Plaintiff's treatment had been relatively effective in controlling his symptoms. (R. 447.) The Court finds Defendant's contention unmeritorious because an ALJ may not "play doctor" and substitute his own opinion for that of a physician, or make judgments that are not substantiated by objective medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996).

[26]Many courts, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, particularly when he cannot afford it. *See e.g., Herron v. Shalala*, 19 F.3d 329, 336 & n.11 (7th Cir. 1994)("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits.")(*citing DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989); *but see Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1998)(failure to seek medical treatment and low dosage use of pain medication cast doubt upon the seriousness of the claimant's ailments). *Cf. Thompson v. Sullivan*, 987 F.2d 1482, 1489-90 (10th Cir. 1993)(case remanded where claimant failed to pursue medical treatment because the ALJ did not consider whether medical treatment was prescribed, was refused by the claimant, would restore the claimant's ability to work, or any other justifiable excuse for the claimant's failure to obtain treatment).

spent their time there. (R. 53.) Plaintiff indicated he sometimes rode his bicycle or walked to the corner store. (R. 54-55.) He stated he watched television, read the newspaper, and did about ten sit-ups every other day. (R. 53-54.) Plaintiff did not leave the house except for when he went to the corner store. (R. 55.) He testified he purchased groceries, cooked for himself and occasionally washed dishes, but he did not clean the house or do laundry. (R. 53-54.) Plaintiff indicated he was able to tend to his personal hygiene which entailed bathing and dressing himself. (R. 54.) He stated he napped for a couple of hours each day after lunch. (R. 62-63.) Furthermore, at the March 6, 2003 administrative hearing, Plaintiff again testified that he spent most of his time at the barbershop watching television and also had lunch with his cousin three days each week at church. (R. 462.)

In her July 18, 2003 decision, the ALJ noted that Plaintiff's "typical day is spent sitting and watching television at his friend's barbershop. He knows everyone at the barbershop and that is all he does." (R. 446.) With regard to his daily activities, the ALJ essentially found two factors that weighed against a finding that Plaintiff was disabled. (R. 447.) First, the ALJ determined that Plaintiff's "alleged limited daily activities cannot be objectively verified with any reasonable degree of certainty" and even assuming Plaintiff's daily activities are as limited as he alleged, the ALJ stated "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. All these factors lead to the conclusion that the claimant's complaints are out of proportion to the medical evidence. Accordingly, the claimant's allegations regarding [his] symptoms and functional limitations are not fully credible." (R. 447.)

The Court is left to ponder what the ALJ means when she states that Plaintiff is not credible based on the fact that his "alleged limited daily activities cannot be objectively verified" and she

48

cannot "attribute the degree of limitation to the claimant's medical condition, as opposed to other reasons." (R. 447.) The Court, therefore, is unable to discern the ALJ's reasoning for her finding that Plaintiff lacks credibility based on his alleged limited daily activities. *See e.g., Brindisi*, 315 F.3d at 787(*quoting* SSR 96-7p, 1996 WL 374186, at *4)(the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make *clear* to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight")(emphasis added); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(per curiam)(*quoting Stephens v. Heckler*, 7666 F.2d 284, 287 (7th Cir. 1985)(an ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'")

The Court notes, however, that Plaintiff's daily activities are fairly restricted and not the type of activities that undermine or contradict his claim of disabling impairments. *See e.g., Zurawski*, 245 F.3d at 887 (finding that the plaintiff's activities "are fairly restricted (*e.g.*, washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"). Herein, the ALJ's analysis of Plaintiff's limited and restricted daily activities does not necessarily equate with his ability to perform the full range of exertional and non-exertional work-related activities. *See e.g., Brown v. Massanari*, No. 00 C 6839, 2001 WL 1315075, at *2 (N.D. Ill. Oct. 26, 2001); *O'Connor v. Sullivan*, 938 F.2d 70, 74 (7th Cir. 1996).

49

The Court finds the ALJ erred in her credibility determination and a remand is warranted.[27]

## CONCLUSION[28]

In view of the foregoing, the Court grants Plaintiff's motion for summary judgment insofar as it requests a remand and grants, in part, and denies, in part, Defendant's motion for summary judgment. Accordingly, the cause is remanded, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this opinion.

ENTER:

IAN H. LEVIN
U.S. Magistrate Judge

Dated: December 27, 2004

---

[27]Defendant argues that an ALJ's credibility finding will not be reversed merely because the ALJ did not "specify which statements were incredible" or "provide an evidentiary basis for the credibility finding." *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003). (Def.'s Mem. at 12.) In *Jens,* the Seventh Circuit found that these types of omissions did not demonstrate that the ALJ's credibility finding was not supported by substantial evidence because the record as a whole provided adequate support for the ALJ's credibility finding. *Id.*

The Court, however, finds Defendant's argument unavailing. As discussed in Section III of this opinion, the ALJ failed in her duty to develop a full and fair record with regard to Plaintiff's exertional limitations; namely, his standing and walking limitations that are caused by his diabetes. Accordingly, because the evidentiary record as a whole does not support the ALJ's credibility finding, it cannot be upheld.

[28]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.